. IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JENNIFER KAMRASS,**<br><br>Plaintiff,<br><br>vs.<br><br>**ADVENTIST HEALTH SYSTEM/SUNBELT, INC. d/b/a ADVENTHEALTH CENTRA CARE,**<br><br>Defendant. | Case No. 2:22-cv-02100-JWB-ADM |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION.**

Defendant Centra Care is an AdventHealth business line that provides urgent care and occupational medicine services in Kansas. At the time relevant to this lawsuit, the occupational medicine services were provided through what was known as Corporate Care. Plaintiff Jennifer Kamrass worked as a nurse practitioner at the Corporate Care clinic from January to June 2021. In early April 2021, Centra Care announced that it would be closing the Corporate Care clinic effective June 25, 2021. When the Corporate Care closure was announced, Kamrass was offered a Per Required Need ("PRN") nurse practitioner position at Centra Care's Urgent Care facility. She declined the position. All 18 Corporate Care employees, nurse practitioners, and physicians, male and female, pregnant and non-pregnant, were displaced as a result of the Corporate Care closure. Some found work within the AdventHealth network, and some, like Kamrass, found work with other health systems. Kamrass was the only pregnant person at Corporate Care when it closed on June 25, 2021.

Kamrass claims in this case that Centra Care's decision to terminate her employment was

motivated by her pregnancy. As set forth herein, Centra Care is entitled to summary judgment as a matter of law because the undisputed material facts show that Kamrass' employment was terminated because Corporate Care closed. Kamrass' pregnancy had nothing to do with the termination of her employment.

Additionally, Kamrass seeks various categories of damages, including back pay, compensatory, and punitive damages. As set forth below, Kamrass is not entitled to these damages as a matter of law.

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS.[1]

### OVERVIEW OF CENTRA CARE'S OPERATIONS IN KANSAS

1.    Centra Care is an AdventHealth business line that provides urgent care and occupational medicine services in Kansas. Deposition of Robert Paswaters ("Paswaters Dep.")[2], 10:21- 11:8.

2.    At the time relevant to this lawsuit, the occupational medicine services were provided through what was known as Corporate Care. Paswaters Dep., 11:6-8.

3.    Centra Care is an "umbrella organization" that incorporated the Urgent Care and Corporate Care business lines. Paswaters Dep., 22:17-19.

4.    Brandy Stephen is the Director of Operations for Centra Care, which included Corporate Care and Urgent Care locations in Kansas. Pretrial Order (Doc. No. 76), ¶2(a)(iv).

5.    Dr. Timothy Hendrix is the Medical Director for Centra Care. Deposition of Timothy Hendrix ("Hendrix Dep.")[3], 10:17-19. Dr. Hendrix's duties include handling "all hiring,

---

[1]In reality, most of Plaintiff's testimony is false. However, as required by Fed. R. Civ. P. 56, Defendant's statement of facts is stated in the light most favorable to Plaintiff and is to be considered uncontroverted only for purposes of this motion.

[2] Paswaters' deposition transcript is attached as Exhibit A.

[3] Hendrix's deposition transcript is attached as Exhibit B.

training, ongoing retraining, complaints, malpractice risks, anything involving clinical care at Centra Care." Hendrix Dep., 12:11-21.

6.    Rob Paswaters is the Vice President and Chief Operating Officer for Centra Care and oversees Centra Care operations. Paswaters Dep., 10:11- 11:2.

7.    Riley Westmoreland is Director of Education and Transformation. Deposition of Riley Westmoreland ("Westmoreland Dep.")[4], 6:22-25. Part of Westmoreland's job responsibilities includes recruiting physicians and nurse practitioners at Centra Care. Westmoreland Dep., 7:19- 8:5. Declaration of Riley Westmoreland ("Westmoreland Decl.")[5], ¶ 4.

8.    Physicians and nurse practitioners at Centra Care are collectively known as "providers." Deposition Jennifer Kamrass (Kamrass Dep.")[6], 9:1-7.

9.    At its peak, Centra Care operated three Corporate Care locations in the Kansas City metropolitan area: two in Missouri (Lee's Summit and North Kansas City) and one in Lenexa, Kansas. Declaration of Robert Paswaters ("Paswaters Decl.")[7], ¶ 4.

10.    Over time, Centra Care closed the Missouri Corporate Care locations for financial reasons as AdventHealth's footprint moved south and west into Kansas. As of January 1, 2021, only the Lenexa Corporate Care location remained open. Paswaters Decl., ¶ 5.

## CENTRA CARE RECRUITING/HIRING

11.    Paswaters approves Centra Care positions to be filled, which starts the recruiting and interviewing/vetting process. Paswaters Dep., 29:18-23; 30:12-14.

---

[4] Westmoreland's deposition transcript is attached as Exhibit C.
[5] Westmoreland's declaration is attached as Exhibit D.
[6] Kamrass' deposition transcript is attached as Exhibit E.
[7] Paswaters' declaration is attached as Exhibit F.

3

12. At all times relevant to this lawsuit, Centra Care positions were not posted internally within Centra Care or AdventHealth. Westmoreland Decl., ¶ 5.

13. Rather, once a position is approved, Westmoreland works with the providers to identify interested candidates through the providers' personal or professional referral networks. Westmoreland Decl., ¶ 6.

14. Westmoreland also identifies candidates through her own referral network and through reviewing resumes and emails she receives directly from interested candidates. Westmoreland Decl., ¶ 7.

15. Dr. Hendrix is the hiring decision-maker for CentraCare. Hendrix Dep., 15:12 – 16:2.

### KAMRASS' EMPLOYMENT AT CORPORATE CARE

16. In November 2020, Centra Care offered and Kamrass accepted a full-time Advanced Practice Registered Nurse ("APRN")[8] position at Centra Care's Corporate Care Lenexa location. Pretrial Order (Doc. No. 76), ¶2(a)(i).

17. Kamrass has a bachelor's and master's degree in nursing. Kamrass' master's degree focused on family practice. Kamrass Dep., 32:22- 34:22.

18. Kamrass had no training in emergency medicine. Kamrass Dep., 34:23-15.

19. Kamrass learned about the Corporate Care nurse practitioner position from Dr. Ramon Nichols with whom Kamrass had worked previously at the University of Kansas Health System. Kamrass and Dr. Nichols were talking about job opportunities, and Dr. Nichols told

---

[8]APRN and nurse practitioner are interchangeable terms. *See* Deposition of Brandy Stephen ("Stephen Dep.") attached as Exhibit G, 51:22- 52:4. Centra Care uses the tern nurse practitioner throughout this motion to track with the terminology used by witnesses.

Kamrass to reach out to Dr. Dale Garrett who worked at Corporate Care, "and they kind of helped facilitate me getting this [Corporate Care] job." Kamrass Dep., 37:11- 39:9.

20.     Kamrass had two interviews—a phone interview "with somebody in HR" and another phone interview with Dr. Hendrix—and then she was offered the position. Kamrass Dep., 46:9- 47:13; 53:4-5.

21.     Kamrass completed a job application at the request of someone in the human resources department after Kamrass was offered the position. Kamrass Dep., 46:25- 47:4; 49:1-4; *See* Centra Care Application for Employment attached as Exhibit I.

22.     Kamrass' position with Corporate Care was not posted internally within Centra Care or AdventHealth. Westmoreland Decl., ¶ 8.

23.     Kamrass began her employment as a nurse practitioner at Corporate Care on January 5, 2021. Pretrial Order (Doc. No. 76), ¶2(a)(ii).

24.     Kamrass was one of three nurse practitioners at Corporate Care. The other two nurse practitioners, Anna Capps and Johnna Argetsinger, were both female. Pretrial Order (Doc. No. 76), ¶2(a)(iii). Capps and Argetsinger job shared and together filled the role of one full-time nurse practitioner. Stephen Dep., 147:11-20.

25.     Corporate Care had two physicians: Dr. Dale Garrett and Dr. Daniel Reeves. Kamrass Dep., 9:13 - 10:-14.

26.     In addition to the five providers, Corporate Care had 13 employees in various administrative and clinical capacities. *See* Centra Care's Answer to Plaintiff's Interrogatory No. 5 attached as Exhibit J.

27.    When Plaintiff was hired, Brandy Stephen told Plaintiff she would start training in Urgent Care in early- or mid-March 2021 and eventually work at Corporate Care and Urgent Care. Kamrass Dep., 76:6-21.

28.    Kamrass did not train at Urgent Care because Dr. Garrett went out of work for health reasons and Argetsinger was out because of a death, "so there just wasn't enough staff at Corporate Care for me to go over there [Urgent Care] and train." Kamrass Dep., 81:22- 82:11.

29.    Kamrass did not work at Urgent Care during her employment with Centra Care. Kamrass Dep., 236:11-17.

## KAMRASS'S PREGNANCY AND CHILDBIRTH

30.    Kamrass gave birth on July 27, 2021. Kamrass Dep., 87:13-15.

31.    Kamrass began telling people at Centra Care in January 2021 on a need-to-know basis that she was pregnant. Kamrass Dep., 87:16- 88:10.

32.    Nobody at Centra Care said anything negative to Kamrass about her pregnancy, and Kamrass is not aware of anyone saying anything negative about her pregnancy. Kamrass Dep., 88:11- 89:24.

33.    Co-workers congratulated Kamrass on her pregnancy. Kamrass Dep., 89:2-5.

34.    Co-workers threw Kamrass a baby shower in May or June 2021. Kamrass Dep., 100:16-25.

35.    Kamrass did not discuss with anyone at Centra Care pregnancy leave or what she was anticipating her leave to be when she gave birth. Kamrass Dep., 88:21-24

## CLOSURE OF THE LENEXA CORPORATE CARE LOCATION

36.    "Corporate Care was struggling financially and so the desire was to improve the overall performance through the closure of Corporate Care." Paswaters Dep., 15:20- 16:3.

37.     The AdventHealth Shawnee Mission leadership team made the decision to close Corporate Care and notified Paswaters of the decision. Paswaters Dep., 16:4-9.

38.     On or around April 1, 2021, Centra Care communicated to its employees, including Kamrass, that Corporate Care would be closing effective June 25, 2021. Pretrial Order (Doc. No. 76), ¶2(a)(v); Kamrass Dep., 91:2-14.

39.     According to Kamrass, "They, they being the people above me, called a meeting and we all met after work and they told us they were closing the [Corporate Care] clinic down." Kamrass Dep., 91:15-18.

40.     The communication that Corporate Care closing was delivered in person by Paswaters and a human resources employee from Florida. Kamrass Dep., 92:8-16; *see also* Paswaters Dep., 18:13-20 (Paswaters testifying he delivered news of the closure in person because he is "the leader of the organization and I felt like it was appropriate for me to share with the team as I had previously when the other Corporate Care sites were closed.").

41.     The purpose of the meeting "was to talk to the team [*i.e.*, the employees] to go over severance information, to explain to them what had happened and what their options might be." Paswaters Dep., 19:5-9.

42.     The closure of Corporate Care also affected providers and "everyone was at risk of losing their job." Paswaters Dep., 16:22-15; 19:10-14.

43.     Kamrass did not know what her role would be after the closure of Corporate Care, but she "assumed" she would still have a job. Kamrass Dep., 95:20- 96:12.

44.     As of April 2021, Dr. Garrett was out on medical leave, and Dr. Reeves was the only physician working at Corporate Care. Kamrass Dep., 107:1-10; Stephen Decl., ¶ 7.

45.    After the announcement that Corporate Care would be closing, the initial plan was for Dr. Reeves to move his occupational medicine practice from Corporate Care into one of the Urgent Care clinics and bring some Corporate Care nurse practitioners with him. This was referred to as a "blending" of the two business lines. Stephen Decl., ¶ 8

46.    The number of Corporate Care nurse practitioners that would be able to transition to Urgent Care with Dr. Reeves depended on the "financial from the clients" – i.e., the demand for nurse practitioner services. Stephen Dep., 70:14- 71:1.

47.    According to Kamrass, Dr. Reeves was "kind of in charge" of blending his Corporate Care practice into Urgent Care. Kamrass Dep., 105:20- 106:16.

48.    Brandy Stephen communicated to Kamrass by email on April 12, 2021: "Right now we are looking at a plan to see how we can utilize you. I'm going to be honest we don't have a clear spot for you yet. We had to look at things such as seniority when making placements and you are the newest hire. It is our goal to find you a home in the transition." Kamrass Dep., 98:13- 102:4; *see also* April 12, 2021, Email Communication attached as Exhibit K.

49.    According to Stephen, her reference to seniority in the April 12, 2021, email meant, "If we were going to place any providers, nurse practitioners, that she [Kamrass] was the newest hire at Corporate Care; so she would be lower on the seniority ranking." Stephen Dep., 76:2-9.

50.    However, according to Stephen, "the nurse practitioners were in limbo. There were no decisions ever officially made for any of them." Stephen Dep., 69:2-7.

51.    Johnna Argetsinger and Anna Capps had worked at Corporate Care longer than Kamrass. Kamrass Dep., 102:20- 103:4.

52.    Dr. Reeves resigned his employment with Corporate Care on May 28, 2021. Stephen Dep., 126:10-21.

53.     Dr. Reeves' resignation on May 28, 2021, ended the plan to blend Corporate Care with Urgent Care. Stephen Decl., ¶ 9.

54.     According to Stephen, "Without Dr. Reeves we could not blend our model. Our clients needed a board-certified occupational health physician for most of them to come over, and without Dr. Reeves, we did not have that; so every plan we had fell through when he resigned." Stephen Dep., 127:2-7.

55.     Kamrass, Argetsinger, and Capps agreed that Dr. Reeves' resignation ended any hope of Corporate Care (or any of them) transitioning to Urgent Care:

- According to Kamrass: "Dr. Reeves found a job somewhere else and so they decided that they didn't want the providers to go over to . . . urgent cares." Kamrass Dep., 108:2-19.

- According to Argetsinger: "It was apparent that Dr. Reeves was leaving and there was no longer going to be a transition at all, and so I had to look for a new job." Deposition of Johnna Argetsinger ("Argetsinger Dep.")[9], 30:6-11.

- According to Capps: Dr. Reeves' resignation "changed the plan of continuing to do Corporate Care at the urgent cares since we wouldn't have had an occ med physician." Deposition of Anna Capps ("Capps Dep.")[10], 48:18- 49:15.

56.     Kamrass's employment with Centra Care ended on June 25, 2021. Pretrial Order (Doc. No. 76), ¶ 2(a)(vii).

57.     The Lenexa Corporate Care location ceased all operations on June 25, 2021. Paswaters Decl., ¶ 8.

58.     Neither Argetsinger nor Capps went to work at Urgent Care. Kamrass Dep., 157:3-8. They both applied for and found work outside of Centra Care in a different area of the AdventHealth system. Capps Dep., 18:9-24; Argetsinger Dep., 12:17-2.3

---

[9] Argetsinger's deposition transcript is attached as Exhibit L
[10] Capps' deposition transcript is attached as Exhibit M.

59. When Corporate Care closed on June 25, 2021, everyone still employed at Corporate Care lost their jobs. Some found work elsewhere within the AdventHealth System. Some did not find work within the AdventHealth system, and their employment ended. Not counting Dr. Reeve's resignation, Kamrass and seven other men and women lost their jobs. Kamrass was the only pregnant employee or provider at Corporate Care when it closed on June 25, 2021. Exhibit J at Answer to Interrogatory No. 5; Stephen Decl., ¶ 10.

## PRN OFFERS AND THE HIRING OF LESLEE BRADY

60. PRN means "as needed; so if we have a shift availability, that's when we would use a prn employee." Stephen Dep., 28:20-24.

61. At Urgent Care "there's always a need for prn nurse practitioners; so we can have as many or as few as – as we can find." Stephen Dep., 142:21- 143:3.

62. Kamrass was offered a PRN nurse practitioner position at Urgent Care on and before May 6, 2021, but she declined it. Pretrial Order (Doc. No. 76), ¶2(a)(vi); Kamrass Dep., 120:4- 121:10.

63. Capps was offered a PRN position at Urgent Care, but she declined it. Capps Dep., 48:18-23; 31:15- 32:7.

64. Leslee Brady contacted Westmoreland in April 2021 about full-time opportunities for work at Centra Care in Kansas, but noting was available at the time. Brady provided her resume. Westmoreland Decl., ¶ 9 & Attachment 1 thereto.

65. Centra Care tasked Westmoreland to recruit for PRN nurse practitioner positions at Urgent Care. Westmoreland Dep., 45:19- 46:1.

66.     Westmoreland contacted Brady on May 7, 2021, to see if she was interested in a PRN nurse practitioner position at Urgent Care in Kansas. Brady responded the same day that she was interested. Westmoreland Decl., ¶ 10.

67.     Brady had the following experience and credentials:

- Current employment as a flight nurse and as a registered nurse in KU Med's emergency department.

- Certifications and licensure in the following: Certified Emergency Nurse; Trauma Certified Registered Nurse; and, Certified Flight Registered Nurse; Advanced Burn Life Support; Neonatal Resuscitation Program; and, Transport Professional Advanced Trauma Course.

- Member of the following organizations: Emergency Nurses Association; Society of Trauma Nurses; Air and Surface Transport Nurse Association; Kansas Advanced Practice Nurses Association; LifeFlight Eagle Safety Advisory Group; and LifeFlight Eagle Peer Support Group.

- Former chair of the KU Med ED Trauma Committee.

Westmoreland Decl., Attachment 1.

68.     Brady also had experience teaching and giving presentations and academic lectures in trauma and emergency nursing. Westmoreland Decl., Attachment 1.

69.     Kamrass has no experience as a flight nurse, was not a member of any of the professional organizations in which Brady was a member, had none of the certifications and licenses Brady had, and has never taught or given presentations or lectures about nursing. Kamrass Dep., 216:5- 217:17.

70.     Westmoreland conducted a phone interview with Brady on May 19, 2021. Westmoreland Decl., ¶ 11.

71.     Dr. Hendrix then conducted a phone interview with Brady on May 28, 2021. Dr. Hendrix told Westmoreland he was impressed with Brady and asked Westmoreland to schedule a video interview. On June 3, 2021, Westmoreland scheduled a video interview for June 10, 2021,

11

to include Westmoreland, Dr. Hendrix, Brandy Stephen, and others in senior management. Hendrix Dep., 67:23- 69:5; Westmoreland Decl., ¶¶ 12-13.

72.     On June 9, 2021, an Urgent Care physician named Dr. Almaguer unexpectedly resigned his position. Paswaters Decl., ¶ 6; Stephen Dep., 129:22- 130:9.

73.     On June 9, 2021, Paswaters approved filling Dr. Almaguer's vacancy at Urgent Care either with a physician or nurse practitioner. Paswaters Decl., ¶ 7; Stephen Dep., 130:10-14.

74.     Westmoreland, Brandy Stephen, and Dr. Hendrix exchanged text messages during the June 10, 2021, interview discussing their agreement that Brady was a great candidate and that they would like to offer her the full-time position . Hendrix Dep., 40:8- 41:7; Stephen Dep., 133:11- 135:21; *see also* June 10, 2021, Text Message Thread attached as Exhibit N.

75.     According to Dr. Hendrix, "because we're on an interview and working separately, it's not uncommon for us to exchange text messages between ourselves as we interview the candidate. And in this one instance, we were all very impressed with the candidate, and I had expressed that in the interview and whether I could extend the offer at that time." Hendrix Dep., 40:14-25.

76.     According to Brandy Stephen, Brady's interview on June 10, 2021, "went very well." Stephen Dep., 132:18-20.

77.     Brady was offered the full-time position on June 10, 2021, created by Dr. Almaguer's resignation rather than the PRN position for which she had been interviewing. Stephen Dep., 132:21- 133:10; 136:18- 137:4.

78.     The decision to hire Brady was made without "forethought going into it [the interview]; it was a decision made "in the moment." Stephen Dep., 152:2-11. *See also* Stephen

12

Dep., 138:4-7 ("We'd just found out the day before that we had an opening, and it kind of all happened in the moment. There was not forethought to anyone.").

79.     Brady accepted the position. Stephen Dep., 145:1-12.

80.     Brady was the only person considered for the full-time Urgent Care nurse practitioner position. Neither Kamrass, Argetsinger, or Capps were considered for the position. Stephen Decl., ¶ 12; Stephen Dep., 136:24- 137:1; 139:12-16 ("I did not consider anyone else.").

81.     As of June 10, 2021, Stephen had not spoken to Kamrass "in quite a while" and "didn't know either way if she was employed or not." Stephen Dep., 137:5-14.

82.     As of June 10, 2021, Stephen did not know the employment status of Argetsinger or Capps. Stephen Decl., ¶ 12.

83.     Kamrass believes Brady was qualified for the full-time Urgent Care nurse practitioner position. Kamrass Dep., 218:7-11.

84.     Kamrass does not believe she is more qualified than Brady for the full-time Urgent Care nurse practitioner position. Kamrass Dep., 218:13-15.

85.     According to Dr. Hendrix, "My position is that she [Kamrass] was not qualified to start in the Urgent Cares." Hendrix Dep., 43:11-23.

86.     According to Brandy Stephen, "I don't know how she [Kamrass] would've done in Urgent Care. It's very different than Corporate Care or family practice." Stephen Dep., 139:17-24.

## OTHER CENTRA CARE PREGNANCIES AND MATERNITY LEAVES

87.     Argetsinger took two periods of maternity leave during her employment with Corporate Care: 16 weeks of leave starting December 2016 and 12 weeks of leave starting July 10, 2019. Argetsinger Dep., 93:5-25.

88.     Capps took maternity leave from mid-January to April 2021. Capps Dep., 61:8-14.

13

89.     Brady took maternity leave from May 5, 2022, to August 22, 2022. Ms. Brady's position was held open for her and she was welcomed back after her leave period ended. Stephen Decl., ¶ 4.

90.     Urgent Care Nurse Practitioner Antoinette Whitcomb took maternity leave from June 21, 2021, to September 19, 2021, and from February 24, 2023, to April 20, 2023. Whitcomb's position was held open for her and she was welcomed back after her leave periods ended. Stephen Decl., ¶ 5.

91.     Urgent Care Patient Registration Coordinator Rebecca Owen took maternity leave from July 6, 2021, to October 7, 2021. Owen's position was held open for her and she was welcomed back after her leave period ended. Stephen Decl., ¶ 6.

**KAMRASS' SUBSEQUENT EMPLOYMENT AT CONSERVATIVE CARE**

92.     An occupational medicine company called Conservative Care "tried to poach all the Corporate Care people since they knew Corporate Care was closing." Kamrass Dep., 164:13-21; 165:9-14.

93.     Kamrass applied for and interviewed for a position at Conservative Care on July 8, 2021. Kamrass Dep., 156:8-10; 164:10-12.

94.     Conservative Care offered Kamrass a job on July 16, 2021, and told her "essentially" that her start date was up to her and "they just wanted me to come back when I was, you know, done with my maternity leave." Kamrass Dep., 164:6-9; 280:4- 281:9. On July 17, 2021, Kamrass accepted a position with Conservative Care. Kamrass Dep., 163:21- 164:1.

95.     Kamrass chose to start on October 18, 2021, because she wanted to spend three months with her new baby. Kamrass Dep., 166:19-21; 204:10-13. *See also* Kamrass Dep., 169:6-10 (Admitting she removed herself from the workforce for three months after she gave birth).

96.    Kamrass earned $1 more per hour at Conservative Care than at Centra Care. Kamrass Dep.; 156:11-18; 229:5-7.

**KAMRASS' CLAIMED DAMAGES AND RELOCATION**

97.    On June 21, 2022, Kamrass received a notice from Great Lakes Educational Loan Services, Inc., that she may qualify for the Public Service Loan Forgiveness ("PSLF") waiver. *See* Pretrial Order, Doc. No. 76, ¶5(a)(v); *see also* PSLF Notice attached as Ex. O and the Department of Education Federal Student Aid's website, which can be accessed at  Public Service Loan Forgiveness | Federal Student Aid  (https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service). [11]

98.    Kamrass moved to Georgia on January 12, 2023, because her husband changed employers. Kamrass Dep., 247:15-23.

99.    Kamrass resigned her position with Conservative Care and found new employment in Georgia. Kamrass Dep., 248:7-23.

## III.    SUMMARY JUDGMENT STANDARD.

Summary judgment is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993). "A genuine issue of material fact exists when 'the evidence, construed in the light most favorable to the non-moving party, is such that a

---

[11]Pursuant to Fed. R. Evid 201, Centra Care asks the Court to take judicial notice of the Department of Education's website.

reasonable jury could return a verdict for the non-moving party.'" *Zwygart v. Bd. of Comm'rs of Jefferson Cnty., Kan.*, 483 F.3d 1086, 1090 (10th Cir. 2007) (quoting *Liberty Lobby*, 477 U.S. at 242). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

## IV.    ARGUMENT.

### A.    Kamrass' Sex/Pregnancy Discrimination Claim Fails as a Matter of Law Because She Cannot Establish a *Prima Facie* Claim of Sex/Pregnancy Discrimination, and Because She Cannot Show Centra Care's Stated Reason for the Termination Decision Was Pretextual.

Kamrass asserts a single count of sex/pregnancy discrimination in which she claims "Centra Care violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., and those provisions of Title VII amended by the Pregnancy Discrimination Act of 1978, by terminating Kamrass' employment based on her pregnancy and sex." Pretrial Order (Doc. No. 76), ¶4(a)(i).

The Pregnancy Discrimination Act ("PDA") amended Title VII "to prevent the differential treatment of women in all aspects of employment based on the condition of pregnancy." *E.E.O.C. v. Ackerman, Hood McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir. 1992) (internal quotations omitted). "Claims made under the PDA are analyzed under the disparate treatment analysis applied in Title VII cases." *E.E.O.C. v. Ackerman, Hood McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir. 1992). To prevail on her claim, Kamrass must first establish a prima facie Title VII sex

discrimination claim by showing: "(1) [s]he belonged to a protected class, (2) [s]he was qualified for [her] position, (3) [s]he suffered an adverse employment action, and (4) [her] position was not thereafter eliminated, or some other circumstances surrounding the adverse action, such as a decisionmaker's discriminatory remarks or preferential treatment toward employees outside the protected class, give rise to an inference of discrimination." *Larson v. United Air Lines*, 482 Fed. Appx. 344, 348 (10th Cir. 2012) (internal quotations omitted).

Where, as here, there is no direct evidence of discrimination, the Court "employ[s] the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). Under that framework, Kamrass must first establish a *prima facie* case of sex discrimination. Centra Care then must articulate a legitimate, non-discriminatory reason for its decisions. The burden then shifts back to Kamrass to show the stated reason for Centra Care's decisions are pretextual. *Id. See also Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).

> **1.    Kamrass Cannot Establish a *Prima Facie* Case of Pregnancy/Sex Discrimination Because She Cannot Show the Termination of Her Employment Occurred under Circumstances Giving Rise to an Inference of Discrimination.**

The fourth element of a prima facie claim of pregnancy/sex discrimination requires Kamrass to show "[her] position was not thereafter eliminated, or some other circumstances surrounding the adverse action, such as a decisionmaker's discriminatory remarks or preferential treatment toward employees outside the protected class, give rise to an inference of discrimination." *Larson*, 482 Fed. Appx. at 348. Kamrass' claim fails because she cannot establish the fourth element of her claim.

First, Kamrass' employment ended on June 25, 2021, when Corporate Care closed and

17

ceased all operations, and her position was eliminated. Defendant's Statement of Uncontroverted Material Facts ("DSOF") ¶¶ 56, 57, 59. Indeed, every employee and provider at Corporate Care lost their job due to the June 25, 2021, closure of Corporate Care. DSOF ¶¶ 56, 57, 59. Kamrass was the only pregnant person at Corporate Care when it closed on June 25, 2021. DSOF ¶¶ 56, 57, 59. Like Kamrass, the two other Corporate Care nurse practitioners, Capps and Argetsinger, did not receive permanent positions at Urgent Care. DSOF ¶¶ 56, 57, 58, 59. They applied for and found work elsewhere. DSOF ¶¶ 55, 58, 59. Neither Capps nor Argetsinger was pregnant.

Next, Kamrass did not discuss with anyone at Centra Care pregnancy leave or what she was anticipating her leave to be when she gave birth in July 2021. DSOF ¶¶ 31, 35. It is axiomatic that Centra Care could not have discriminated against Kamrass based on leave it had no knowledge she was planning to take. Further, the undisputed facts contradict Kamrass' pregnancy discrimination claim. In the years before and after Kamrass' employment, Capps, Argetsinger, and three other Centra Care employees and providers took multiple periods of maternity leave. Their positions were held open for them and they were welcomes back after their leave. DSOF ¶¶ 87, 88, 89, 90, 91. Indeed, one provider at Urgent Care was on maternity leave at the same time Kamrass' employment ended allegedly because she was pregnant. DSOF ¶¶ 57, 59, 90. Kamrass' belief that Centra Care wanted her gone because she was pregnant is speculative and disproved by the facts.

Finally, nobody at Centra care said anything negative to Kamrass about her pregnancy. To the contrary, she was congratulated and her co-workers threw her a baby shower. DSOF ¶¶ 31, 32, 33, 34.

There is no evidence to support Kamrass' belief that she suffered pregnancy discrimination, and as such, no reasonable jury could conclude Kamrass' employment was terminated because of

her pregnancy. "To survive summary judgment, the plaintiff's 'evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Fuller v. Kan., Dep't of Children & Families*, No. 16-2415-DDC-JPO, 2019 WL4573416, at \*6 (D. Kan. Sep. 20, 2019), *aff'd*, 805 F. App'x 601 (10th Cir. 2020) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *Rice v. U.S.*, 166 F.3d 1088, 1092 (10th Cir. 1999)). Accordingly, Kamrass cannot establish a prima facie claim of pregnancy discrimination, and her claim fails as a matter of law.

> **2.    Centra Care Terminated Kamrass' Employment for Legitimate, Non-Discriminatory Reasons, and Kamrass Cannot Show the Stated Reason for the Termination Decision Was Pretextual.**

Even if Kamrass could establish a *prima facie* case of sex discrimination (which she cannot), Centra Care has met its burden to come forward with a legitimate non-retaliatory reason for the termination decision and Plaintiff cannot show the decision was pretextual.

> **a.    Centra Care's Legitimate, Non-Discriminatory and Non-Retaliatory Reason for the Termination Decision.**

Centra Care's burden to set forth its legitimate reason "is exceedingly light; the defendant must merely proffer non-sex-based reasons, not prove them." *Bird v. W. Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016). Here, it is undisputed that Corporate Care closed on June 25, 2021, and ceased all operations, and that all employee and provider positions were eliminated. DSOF ¶¶ 57, 59. Kamrass was the only pregnant person at Corporate Care when it closed. DSOF ¶ 59.

> **b.    Kamrass Cannot Show Centra Care's Stated Reason for the Termination Decision was Pretextual.**

"A plaintiff may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence and hence

infer that the employer did not act for the asserted non-discriminatory reason." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (internal quotations omitted). Importantly, "[m]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Id.* Indeed, a "plaintiff can't establish pretext based on mere speculation." *Fuller*, 2019 WL4573416, at *11 (granting summary judgment for employer where employee asserted her own speculative beliefs about why her employment was terminated but cited no admissible evidence to support her assertions, and noting that employee's speculative assertions "flatly contradict[ed]" her discrimination claim); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1237-38 (10th Cir. 2015) (affirming summary judgment for employer because plaintiff "merely advanced speculative theories" that failed to demonstrate pretext); *Webster v. Shulkin*, 707 F. App'x 535, 542 (10th Cir. 2017) (holding that plaintiff's "claims don't rise above the level of speculation, which is insufficient to demonstrate pretext").

Kamrass may claim she can show pretext because she believes she should have been hired for the nurse practitioner position that went to Leslee Brady. Kamrass' belief that she should have received the position is irrelevant to the Court's inquiry because the pretext analysis considers only the facts as they appeared to the decisionmakers. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007); *see also Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1310 (10th Cir. 2017) (affirming summary judgment for defendant because "it ultimately is immaterial whether Ms. Baskett–McEnany's belief was actually correct—*viz.*, her belief that Ms. DeWitt's hang-ups were intentional; what matters is that Ms. Baskett–McEnany 'honestly' held that belief and 'acted [on it] in good faith.') (citing *Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)). Here, there is no evidence that the decisionmakers who hired Brady acted with discriminatory animus. First, Brady was being interviewed for a PRN position, and was contacted about the position on May 7,

2021, after Kamrass declined a PRN position. DSOF ¶¶ 60, 61, 62, 64, 66. An Urgent Care physician unexpectedly resigned on June 9, 2021, the day before Brady's full interview on June 10, 2021, (and a week after the interview had been set on June 3, 2021). DSOF ¶¶ 70, 71, 72, 73. Paswaters approved the position to be filled with a nurse practitioner or physician. DSOF ¶¶ 72, 73. The interview panel was impressed with Brady on June 10, 2021, and in the moment decided to offer her the full-time position that became available only the day before. DSOF ¶¶ 71, 72, 74, 75, 76, 77, 78. Nobody but Brady was considered – not Argetsinger, not Capps, and not Kamrass. DSOF ¶¶ 72, 73, 74, 75, 76, 77, 78, 80, 81. In fact, Brandy Stephen had not spoken to Kamrass in quite a while and did not know the job search status of Kamrass, Capps, or Argetsinger. DSOF ¶¶ 80, 81. There is no evidence on these facts that the decisionmakers acted with discriminatory animus.

Kamrass may also claim she can show pretext by arguing that the full-time nurse practitioner for which Brady was hired should have been posted. However, this is a red herring. Kamrass' own position at Corporate Care was not posted, and the undisputed facts are that Centra Care positions were not posted internally. DSOF ¶¶ 11, 12, 13, 14, 15, 16, 19, 20, 21, 22.

Kamrass also may argue that the termination decision was harsh or unreasonable, but that too is of no consequence. "Evidence that the employer should not have made the termination decision – for example, that the employer was mistaken or used poor business judgment – is not sufficient to show that the employer's explanation is unworthy of credibility." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007); *see also Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1083 (10th Cir. 1999) ("Our role is to prevent unlawful . . . practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

**B.     Kamrass Is Not Entitled to Punitive Damages.**

Kamrass seeks punitive damages through this lawsuit. Pretrial Order, Doc. 76, ¶ 5(a)(iii). Punitive damages are recoverable under Title VII in cases "in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the [employee's] federally protected rights." *Kolstad v. Am. Dental Assn*, 527 U.S. 526, 529-30 (1999) (internal citations, quotations, and brackets omitted); *see also* 42 U.S.C. § 1981a(b)(1). To establish a submissible claim for punitive damages, Plaintiff must show proof that the employer acted "in the face of a perceived risk that its actions [would] violate federal law." *Kolstad*, 527 U.S. at 535-536 (brackets in original). Where a plaintiff fails to rebut her employer's legitimate, non-discriminatory, and non-pretextual reasons for the termination of her employment, she cannot demonstrate that she is entitled to punitive damages. *Margolis v. Pub. Health Tr. of Miami-Dade Cnty.*, 89 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015) (granting employer's summary judgment motion as to punitive damages where employee failed to demonstrate that employer engaged in a discriminatory practice, much less malice or reckless indifference to his federally protected rights by discharging employee as part of reduction in force). Further, "[w]here an employer has undertaken … good faith efforts at Title VII compliance, it demonstrates that it never acted in reckless disregard of federally protected rights." *Id*. at 544. (internal citations, quotations, and brackets omitted). The Court should rule as a matter of law that Kamrass is not entitled to punitive damages because no reasonable jury could find that Centra Care "acted with malice or indifference to her federally protected rights.

Here, Kamrass cannot rebut Centra Care's legitimate, non-discriminatory reasons for the termination of her employment, namely, the closure of Corporate Care on June 25, 2021, nor can she show that Centra Care acted with malice or reckless indifference to her federally protected rights. When Corporate Care closed, Kamrass and 17 other employees and providers' employment

ended. DSOF ¶¶ 8, 24, 25, 26, 57, 59. The possibility of blend ended when Dr. Reeves resigned on May 28, 2021. DSOF ¶¶ 52, 53, 54, 55. No provider from Corporate Care went to work at Urgent Care, including the two other nurse practitioners, Argetsinger and Capps. Every employee of Corporate Care lost their job when Corporate Care closed. DSOF ¶¶ 52,53, 54, 55, 56, 57, 58, 59. Kamrass was the only pregnant employee or provider at Corporate Care when it closed. DSOF ¶ 59. It defies logic and common sense to credit that Kamrass' pregnancy had anything to do with the termination of her employment. On these facts, Kamrass has failed to establish a submissible case for punitive damages as a matter of law. Accordingly, Centra Care is entitled to summary judgment as to Kamrass' punitive damages claim.

**C.      Kamrass Is Not Entitled to Back Pay Beyond July 17, 2021.**

Kamrass claims that she is entitled to back pay from the date her employment with Centra Care ended (June 25, 2021) through the date she began her new employment with Conservative Care (October 18, 2021). Doc. 76, pp. 8-9, ¶ 5(a)(i). Kamrass is incorrect as a matter of law. Kamrass is not entitled to backpay beyond July 17, 2021, the date she accepted her position with Conservative Care.

The court may award back pay as part of damages for unlawful discrimination. 42 U.S.C. §2000e-5(g). The back pay accrual period ends when a plaintiff is offered employment "substantially equivalent" to her previous job. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 236 (1982) (a Title VII plaintiff's right to backpay ends when she "finds a better or substantially equivalent job" because she "no longer suffers ongoing injury stemming from the unlawful discrimination").

Here, Kamrass accepted employment with Conservative Care on July 17, 2021, and was told she could determine her own start date. DSOF ¶¶ 94, 95. She chose October 18, 2021, because she wanted to take time after the birth of her child on July 27, 2021. DSOF ¶¶ 94, 95.  Kamrass

admitted at her deposition she took herself out of the workforce after her pregnancy and chose her start date at a time that worked for her. DSOF ¶¶ 94, 95. Kamrass earned more at Conservative Care than she did at Centra Care. DSOF ¶ 96. Accordingly, Kamrass is ineligible for back pay after July 17, 2021.

### D. Kamrass Is Not Entitled To Damages under the Public Service Loan Forgiveness Program.

Kamrass seeks $24,506 in damages for her alleged loss of eligibility for the PSLF loan forgiveness program. Doc. No. 76, ¶ 5(a)(v). Kamrass cannot recover these damages as a matter of law. First, although compensatory damages are available under Title VII, damages must not be conjectural or speculative. *See e.g., Lippoldt v. Cole,* 311 F. Supp. 2d 1263, 1273 (D. Kan. 2004), aff'd, 468 F.3d 1204 (10th Cir. 2006) ( "speculative damages are not to be awarded") (citing *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988)); *see also Savage v. Temple Univ. - of Commonwealth Sys. of Higher Educ.*, No. CV 19-6026-KSM, 2022 WL 911153, at *14 (E.D. Pa. Mar. 29, 2022) (citing *Gunby*, 840 F.2d at 1121).

Here, Kamrass' claim that she would have stayed working for Centra Care and would have obtained $24,506 in loan repayment is speculative but also contradicted by the undisputed facts.

Here, nearly one year *after* Kamrass' employment with Centra Care ended, Kamrass received notice from Great Lakes Educational Loan Services, Inc., that she "may be eligible" for loan forgiveness under the PSLF program. DSOF ¶ 97. Eligibility for the PLSF program requires, among other things, an individual to make 120 qualifying payments (*i.e.*, 10 years of payments) while working full-time for a qualifying employer (*i.e.*, a non-profit organization). DSOF ¶ 97. The PSLF program ended October 31, 2022. DSOF ¶ 97.

First, it is entirely speculative that Kamrass would have been working at Centra Care in June 2022 when she received the letter. Even if her employment was not terminated in June 2021,

24

any number of events could have intervened to cause her not to be employed a year later. Further, Kamrass received her master's degree in July 2020, Complaint, Doc. No. 1., ¶ 14, so the 120 qualifying payments by Kamrass needed to become eligible for the program will not occur at least until July 2030—nearly eight years *after* the program ended. Finally, Kamrass moved to Georgia in January 2023 because her husband found new employment. DSOF ¶ 98. She resigned her position in Kansas and found new work, which proves conclusively she would not have been eligible for the re-payment program. DSOF ¶¶ 97, 98, 99. For all these reasons, the Court should rule as a matter of law that Kamrass cannot claim any loan repayment as a category of damages.

## V.      CONCLUSION.

Even assuming the truth of Kamrass' allegations, her claims fail as a matter of law for the reasons set forth above. Centra Care respectfully request that the Court grant this Motion and enter judgment for Centra Care on Plaintiff's Complaint.

Respectfully submitted,

/s/ Robert A. Sheffield
Robert A. Sheffield, KS #25732
Direct: 816.627.4432
E-Fax: 816.817.1622
rsheffield@littler.com
Traer Cundiff, KS #23002
Direct: 816.627.4434
E-Fax: 816.368.9121
tcundiff@littler.com
LaceShionna N. Cline, KS #29121
Direct: 816.627.4407
E-Fax: 816.817.6543
lcline@littler.com
LITTLER MENDELSON, P.C.
1201 Walnut Street, Suite 1450
Kansas City, MO 64106

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2023, I electronically filed a true and correct copy of the foregoing using the CM/ECF system, which sent notice of electronic filing to the following counsel of record:

Peter K. Andreone
Dan Saathoff
KENNYHERTZ PERRY, LLC
2000 Shawnee Mission Pkwy, Suite 210
Mission Woods, KS  66205
peter@kennyhertzperry.com
danny@kennyhertzperry.com

ATTORNEYS FOR PLAINTIFF

/s/ Robert A. Sheffield
Attorney for Defendant

26