IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

Jennifer Kamrass,

        Plaintiff,

v.                                                                      Case No. 22-cv-2100-JWB

Adventist Health System/Sunbelt, Inc.
d/b/a AdventHealth Centra Care,

        Defendant.


## MEMORANDUM & ORDER

Plaintiff Jennifer Kamrass filed this lawsuit against defendant, her former employer, asserting that defendant terminated her employment based on her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This matter comes before the court on defendant's motion for summary judgment (Doc. 77).  The motion is fully briefed and ready for decision.  For the reasons stated herein, defendant's motion is granted.


I.    **Facts**

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to Plaintiff as the nonmoving party.  Factual disputes about immaterial matters are not relevant to the court's determination.  Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

Defendant Adventist Health System/Sunbelt, Inc. d/b/a AdventHealth Centra Care (hereinafter "Centra Care") is an AdventHealth business line that provides urgent care and

occupational medicine services in Kansas.   At the time relevant to this lawsuit, Centra Care's

occupational medicine services were provided through what was known as Corporate Care.

Centra Care is a "umbrella organization" that incorporated the Urgent Care and Corporate Care

business lines.   At its peak, Centra Care operated three Corporate Care locations in the Kansas

City metropolitan area: two in Missouri (Lee's Summit and North Kansas City) and one in Lenexa,

Kansas.   Over time, Centra Care closed the Missouri Corporate Care locations for financial

reasons.  As of January 1, 2021, only the Lenexa Corporate Care location remained open.

In November 2020, Plaintiff Jennifer Kamrass accepted a full-time nurse practitioner

position at Centra Care's Lenexa, Kansas Corporate Care location, a position that included health

benefits and a guarantee of 40 hours of work per week.  On January 5, 2021, Plaintiff began her

employment as a nurse practitioner at Corporate Care.[1]   Plaintiff was one of three nurse

practitioners at Corporate Care.   The other two nurse practitioners, Anna Capps and Johnna

Argetsinger, shared the role of one full-time nurse practitioner. Both Ms. Capps and Ms.

Argetsinger were employed at Corporate Care before Plaintiff was hired.   Two physicians also

worked at Corporate Care—Dr. Dale Garrett and Dr. Daniel Reeves.   Physicians and nurse

practitioners at Centra Care are collectively known as "providers."   In addition to the five

providers at Corporate Care, Centra Care employed thirteen individuals at Corporate Care in

administrative and clinical capacities.

Brandy Stephen is Centra Care's Director of Operations.  At the time Plaintiff was hired,

Ms. Stephen told Plaintiff that she would start training in Urgent Care in early or mid-March 2021

---

[1] Plaintiff was previously employed under the AdventHealth "umbrella" (rather than the Centra
Care "umbrella") as a registered nurse for two relatively brief time periods.

and that she would eventually "float" between Corporate Care and Urgent Care.  As it turned out, Plaintiff never trained at Urgent Care because Dr. Garrett was on medical leave and Ms. Argetsinger was on leave because of a death in her family.  According to Plaintiff, then, Corporate Care was short-staffed and there was no opportunity for her to leave Corporate Care to train at Urgent Care.  It is undisputed that Plaintiff did not work at Urgent Care at any time during her employment with Centra Care.  Shortly after she began her employment in January 2021, Plaintiff notified her Corporate Care coworkers and management that she was pregnant.  It is uncontroverted that Ms. Stephen was aware of Plaintiff's pregnancy by April 12, 2021.

On April 1, 2021, Centra Care communicated to its Corporate Care providers and employees, including Plaintiff, that Corporate Care would be closing effective June 25, 2021. That message was delivered in person by Rob Paswaters, Centra Care's Vice President and Chief Operations Officer.  Mr. Paswaters oversees Centra Care operations and approves the filling of Centra Care positions, which starts the recruiting and interviewing process.  It is uncontroverted that the decision to close the final Corporate Care location was made by the AdventHealth leadership team and was based on financial reasons.  At that time, Centra Care intended to blend the Corporate Care and Urgent Care business lines by having Dr. Reeves move his occupational medicine practice into one of the Urgent Care clinics and bring some Corporate Care nurse practitioners with him.  The number of Corporate Care nurse practitioners that would be able to transition to Urgent Care with Dr. Reeves depended on the demand for those services.  Ms. Stephen, Dr. Timothy Hendrix (Centra Care's Medical Director) and Mr. Paswaters together made decisions on whether Corporate Care providers would be moved to Urgent Care with the anticipated merger or whether the providers would be terminated with the closure of Corporate

Care.  Corporate Care providers were also able to look for new jobs within the AdventHealth system but outside the Centra Care umbrella.

On April 12, 2021, Ms. Stephen sent an email to all Corporate Care employees and providers concerning the blending of the Corporate Care and Urgent Care lines.  The email outlined the transition plan and indicated that some team members would be transitioning from Corporate Care to Urgent Care.  Around this time, Ms. Stephen communicated to Ms. Capps and Ms. Argetsinger that they could continue to job-share a full-time nurse practitioner position at Urgent Care as part of the transition of Dr. Reeves' practice—that is, that Ms. Capps and Ms. Argetsinger would continue to provide occupational medicine services.  In response to Ms. Stephen's April 12, 2021, email, Plaintiff sent an email asking Ms. Stephen "where [she] might end up" in light of the transition and expressed concern that "I am not in a great position to try and find new employment with my contract and pregnancy."  Ms. Stephen replied as follows:

> Right now, we are looking at a plan to see how we can utilize you.  I'm going to be honest we don't have a clear spot for you yet.  We had to look at things such a [sic] seniority when making placements and you are the newest hire.  It is our goal to find you a home in the transition.  Will have a clearer picture for you in the next two weeks. I know looking for a new position right now is difficult for you, but I also understand if you feel like you need to take a look at other options at AdventHealth. I will update you as soon as I have more information.  Thanks.

Plaintiff asked a follow-up question about Ms. Stephen's reference to seniority, but Ms. Stephen never responded to that email.

On April 14, 2021, Ms. Stephen emailed other management personnel concerning upcoming pregnancy due dates for Plaintiff and Antoinette Whitcomb, a full-time nurse practitioner at Urgent Care.  In that email, Ms. Stephen discussed the need for PRN coverage at

Urgent Care after the merger in light of Ms. Whitcomb's due date.[2]  She further expressed her belief that "I think [Plaintiff] will be separated with the closing of Corporate Care on the 25th of June."  When asked for clarification on the transition plan, Ms. Stephen indicated that "Jennifer Kamrass is the provider not coming over."  According to Plaintiff, then, Ms. Stephen had already determined on April 14, 2021, that Plaintiff would not transition to Urgent Care and would be terminated with the closing of Corporate Care.

Two days later, on April 16, 2021, Ms. Stephen sent an email to several AdventHealth management and human resources employees in which she asked them for assistance in finding Plaintiff other employment at AdventHealth:

> I wanted to reach out to you on behalf of Jennifer Kamrass.  She is our APP we brought on in January that we will no longer be able to keep.  She has been a long time AdventHealth employee and would so very much like to stay within the AdventHealth family.  Her work ethic is impeccable and she is very knowledgeable. What is most heart wrenching for me is she is pregnant and due in a couple of months.  I am hoping with the help of you amazing group of ladies we can at least give her a fighting chance within the company.  If you know of any positions, or know any other ways we can help her I would greatly appreciate it.  She would be an asset to any team and has been a life saver for us.  Thanks!

Plaintiff points to this email as additional evidence that Ms. Stephen had decided by mid-April 2021 that Plaintiff would not be transitioning to Urgent Care and would be terminated with the closing of Corporate Care.

At some point in April 2021, Leslee Brady contacted Riley Westmoreland about a full-time nurse practitioner position at Centra Care in Kansas and provided Ms. Westmoreland with her resume.  Ms. Westmoreland is the Director of Education and Transformation for Centra Care

---

[2] "PRN" means "as needed" and, according to Plaintiff, a PRN position does not guarantee any specific number of hours and does not include benefits.

and her job responsibilities include recruiting physicians and nurse practitioners at Centra Care. Ms. Westmoreland advised Ms. Brady that nothing was available at that time.  On May 6, 2021, Centra Care offered Plaintiff a PRN nurse practitioner position at Urgent Care.  Plaintiff declined the PRN position.  The following day, on May 7, 2021, Ms. Westmoreland contacted Ms. Brady to see whether she was interested in a PRN nurse practitioner position at Urgent Care in Kansas. Ms. Brady responded that she was interested in that position.  Ms. Westmoreland conducted a phone interview with Ms. Brady on May 19, 2021.  Dr. Hendrix then conducted a phone interview with Ms. Brady on May 28, 2021.  Dr. Hendrix told Ms. Westmoreland that he was impressed with Ms. Brady and asked her to schedule a video interview with Ms. Brady.  That interview was scheduled for June 10, 2021.

On May 28, 2021, Dr. Reeves resigned his employment with Corporate Care. His resignation ended the plan to blend Corporate Care with Urgent Care because Centra Care did not have another board-certified occupational health physician.  Plaintiff, Ms. Capps and Ms. Argetsinger all testified that Dr. Reeves' resignation ended any hope that any of them would transition to Urgent Care to provide occupational medicine services.  Dr. Reeves' resignation, however, did not affect the need for PRN staffing at Urgent Care.  Centra Care, then, offered Ms. Capps a PRN position at Urgent Care and she declined that position.  Ms. Argetsinger had worked as a PRN nurse practitioner at Urgent Care since February 2014 and she continued to do so, picking up occasional hours to supplement her part-time position.  By late May, however, Ms. Capps and Ms. Argetsinger understood that they needed to find positions outside of the Centra Care umbrella.

On June 9, 2021, the day before Centra Care's interview with Leslee Brady for a PRN position, an Urgent Care physician unexpectedly resigned his position. That same day, Mr. Paswaters approved filling that provider vacancy with either a physician or a nurse practitioner. On June 10, 2021, Ms. Westmoreland, Dr. Hendrix and Ms. Stephen conducted the video interview with Ms. Brady. During the interview, Dr. Hendrix exchanged text messages with Ms. Westmoreland and Ms. Stephen in which he asked whether he could extend an offer to Ms. Brady for the full-time provider position that had been approved one day earlier. Dr. Hendrix, Ms. Westmoreland and Ms. Stephen all agreed that Ms. Brady was a great candidate and they offered her the full-time position rather than the PRN position for which she had been interviewing. Ms. Brady accepted the position and she was the only person ever considered for it. Ms. Brady had never worked for AdventHealth in any capacity.

As of June 10, 2021, Ms. Stephen did not know whether Plaintiff, Ms. Capps or Ms. Argetsinger had found employment comparable to their Corporate Care positions or any employment at all. Plaintiff was still employed with Centra Care on June 10, 2021, and was still looking for a full-time position. Ms. Stephens did not make any effort to check on Plaintiff's employment status at the time she participated in the decision to hire Ms. Brady. Ms. Stephen testified that she had not spoken to or heard from Plaintiff "in quite a while" at the time they hired Ms. Brady and that Plaintiff was not "on [her] radar." She testified that she assumed Plaintiff had

found another job because she had heard that Plaintiff had received several interviews and had not heard more from Plaintiff.[3]

Corporate Care ceased all operations on June 25, 2021, and Plaintiff's employment ended on that date.  On July 17, 2021, Plaintiff accepted a position with an occupational medicine company.  Ms. Capps and Ms. Argetsinger each accepted an offer to share the role of one full-time nurse practitioner in the AdventHealth system but outside the Centra Care umbrella. Thus, Plaintiff, Ms. Capps and Ms. Argetsiner all lost their employment with Centra Care as a result of the closing of the Corporate Care facility.

Ms. Argetsinger took two periods of maternity leave during her employment with Centra Care—sixteen weeks of leave beginning in December 2016 and twelve weeks of leave beginning in July 2019.  Ms. Capps took maternity leave from mid-January 2021 to April 2021.  Ms. Brady took maternity leave from May 5, 2022, through August 22, 2022, and her position was held open for her.  Ms. Whitcomb took maternity leave from June 21, 2021, to September 19, 2021.  Her position was held open for her.  Rebecca Owen, a patient registration coordinator at Urgent Care, took maternity leave from July 6, 2021, through October 7, 2021, and her position was held open for her.  Plaintiff does not controvert that each of these employees were "welcomed back" after her leave period ended.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

---

[3] In May and June 2021, Plaintiff applied and interviewed for multiple full-time positions within AdventHealth.  None of these positions fell under the Centra Care umbrella and none involved the decisionmakers at issue here.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Discussion

In the pretrial order, Plaintiff asserts that Centra Care terminated her employment because she was pregnant.  Title VII prohibits employers from terminating an employee because of the employee's sex and, more specifically, because the employee is pregnant.  *See Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 882 (10th Cir. 2018) (citing 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1)).  Plaintiff concedes that she has no direct evidence of discrimination, and her claim is therefore analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See id.* at 884.  Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*.  The parties agree that Plaintiff has

established the first three elements of her prima facie case—that (1) she is a member of a protected class (2) who was terminated (3) despite being qualified for her position. *See id*. But the parties disagree as to the correct formulation of the fourth element of Plaintiff's prima facie case. Centra Care contends that Plaintiff must—and cannot—show that she was terminated under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). Plaintiff asserts that she can establish the fourth element by showing that her job was not eliminated. *Fassbender*, 890 F.3d at 884 (defining fourth element in the context of that case as requiring evidence that the plaintiff's job was not eliminated).

While the *Fassbender* formulation of the prima facie case is clearly appropriate in some cases, it is not helpful to Plaintiff here. Plaintiff argues that her "job remained open" after Corporate Care closed and that she was replaced by Ms. Brady. She bases this argument on her disingenuous assertion that she was initially hired "as a full-time Nurse Practitioner at Urgent Care." No reasonable jury could conclude that Centra Care hired Plaintiff in November 2020 as a full-time nurse practitioner at Urgent Care. While Centra Care intended to train Plaintiff at Urgent Care beginning in March 2020, it is undisputed that such training never occurred due to staffing shortages at Corporate Care and it is undisputed that Plaintiff never worked at Urgent Care in any capacity. Moreover, it is undisputed that Plaintiff worked exclusively at Corporate Care; that the Corporate Care facility closed permanently for financial reasons; and that every provider and employee at Corporate Care lost his or her Corporate Care job as of June 25, 2021. In such circumstances, it is clear that Plaintiff's job was eliminated. Plaintiff, then, cannot establish a prima facie case of discrimination under the formulation she advances.

The court, then, turns to Centra Care's formulation of the prima facie case. Centra Care contends that Plaintiff must come forward with evidence that her termination took place under circumstances giving rise to an inference of discrimination. According to Centra Care, Plaintiff cannot establish this element because her position was eliminated and every provider and employee at Corporate Care lost his or her Corporate Care job when the facility closed. Under Centra Care's formulation of the prima facie case, then, an employee who is terminated when an employer closes a facility or plant will never satisfy his or her initial burden under *McDonnell Douglas* and will likely never establish pretext in the absence of evidence that casts doubt on the employer's business decision to close the facility. Centra Care's argument, here, is too restrictive and does not fully appreciate the nature of Plaintiff's claim.

As the parties' submissions reflect, Plaintiff's claim focuses not on Centra Care's decision to close the Corporate Care facility but its employment decisions in the wake of that closure. For example, both parties dedicate a significant portion of their pretext arguments to evidence about Centra Care's treatment of Plaintiff in the aftermath of the decision to close Corporate Care as compared to Centra Care's treatment of Ms. Capps and Ms. Argetsinger in the aftermath of the closure. Because neither party has framed the prima facie case elements to fit the contours of this case and the record evidence, the parties' arguments are more appropriately analyzed at the pretext stage. The court assumes, then, without deciding, that Plaintiff has established a prima facie case of discrimination.

The court turns, then, to whether Centra Care has met its burden to articulate a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder*

*Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here.  *See id*.  According to Centra Care, it terminated Plaintiff's employment because Corporate Care ceased all operations on June 25, 2021, and all positions were eliminated.  Centra Care further asserts that no Corporate Care employees were transferred to Urgent Care and that all employees lost their employment with Centra Care as of June 25, 2021.  The burden of proof, then, shifts back to Plaintiff to show that defendant's proffered reason is pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (citations and quotations omitted).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011).  In essence, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Dewitt*, 845 F.3d at 1307 (citations and quotations omitted).

Plaintiff sets forth four arguments in an effort to establish pretext: (1) Ms. Capps and Ms. Argetsinger were both offered comparable positions at Urgent Care after the decision was made

to close Corporate Care and yet Plaintiff, the only pregnant provider, was not offered a comparable position at Urgent Care; (2) Ms. Stephen's representation to Plaintiff that there was not a full-time provider position available at Urgent Care was untrue because Centra Care hired Ms. Brady for a full-time position, a position for which Centra Care did not even consider Plaintiff; (3) Ms. Stephen contradicted her statement about seniority by hiring Ms. Brady, who had no seniority within the AdventHealth system; and (4) Centra Care's decision to hire Ms. Brady violated its posting policy that required open positions to be posted internally for a minimum of 3 days. Plaintiff's evidence, viewed in combination and in the light most favorable to her, is insufficient to cast doubt on Centra Care's proffered reason for not retaining Plaintiff in a full-time position after it closed the Corporate Care facility.

*Treatment of Non-Pregnant Providers*

Plaintiff's primary argument as it relates to pretext is that she was treated less favorably than the non-pregnant providers at Corporate Care—Ms. Capps and Ms. Argetsinger. According to Plaintiff, Ms. Stephen in mid-April 2021 offered Ms. Capps and Ms. Argetsinger the opportunity to job-share a full-time nurse practitioner position at Urgent Care. In contrast, by mid-April, Ms. Stephen had decided that Plaintiff was not going to transition to Urgent Care. These facts are an accurate description of the circumstances that existed in April 2021. In the end, however, Ms. Capps and Ms. Argetsinger were treated the same as Plaintiff. None secured full-time positions at Urgent Care because the plan to blend Corporate Care and Urgent Care ended with the resignation of Dr. Reeves. At that point, full-time work at Urgent Care was not available

for Ms. Capps, Ms. Argetsinger or Plaintiff.   PRN positions, however, remained available at Urgent Care and both Plaintiff and Ms. Capps were offered but declined a PRN position.

While Plaintiff concedes that she was ultimately treated the same as Ms. Capps and Ms. Argetsinger with respect to the Urgent Care positions, she contends that this treatment is not pertinent because initially those women were offered comparable positions at Urgent Care even though that arrangement never materialized.   But Plaintiff does not explain how this fact might permit a jury to infer pretext.   Ms. Stephen indicated to Plaintiff that she was looking at seniority in determining placements in the transition to Urgent Care and that Plaintiff was the "newest hire." Plaintiff has no evidence suggesting that Ms. Stephen did not, in fact, plan to transition Ms. Capps and Ms. Argetsinger to Urgent Care because they had been with Centra Care longer than Plaintiff. She offers no basis to conclude that she should have been selected first over Ms. Capps and Ms. Argetsinger and, more importantly, she offers no evidence that there was more than one full-time nurse practitioner position available at Urgent Care under the transition plan.   And because the transition plan never materialized in any event, Plaintiff engages in speculation when she contends that Centra Care treated Ms. Capps and Ms. Argetsinger more favorably than it treated her.   It is undisputed that Centra Care did not retain any providers when it closed the Corporate Care location. *See Smith v. Global Staffing*, 621 Fed. Appx. 899, 903 (10th Cir. 2015) (no pretext from treatment of similarly situated employees where uncontroverted evidence demonstrated that plaintiff's treatment was the same as all other employees who were similarly situated to him)

14

(unpublished disposition cited for its persuasive value).  Centra Care's treatment of its non-pregnant providers, then, does not permit an inference of discrimination.[4]

*The Decision to Hire Ms. Brady*

Plaintiff contends that Centra Care's decision to hire Ms. Brady for a full-time nurse practitioner position is evidence of pretext for two reasons.  First, she contends that Ms. Stephen had been representing to Plaintiff that no full-time positions were available at Urgent Care and that this representation was untrue as evidenced by the hiring of Ms. Brady.  Second, she contends that Centra Care never considered Plaintiff for this position or checked on her employment status, suggesting an intent to discriminate against Plaintiff on the basis of her pregnancy.

It is undisputed that the full-time position filled by Ms. Brady did not become available until June 9, 2021.  At that time, Ms. Stephen had not communicated with Plaintiff for several weeks.  There is no evidence, then, that Ms. Stephen ever told Plaintiff that a full-time position was not available when a position in fact was available.  Stated another way, Ms. Stephens didn't lie, the truth just changed; each time that Ms. Stephen represented to Plaintiff that no open full-time position existed at Urgent Care, that representation was true.

With respect to Centra Care's decision to hire Ms. Brady without considering Plaintiff, Plaintiff points to no evidence suggesting that Centra Care was obligated to continue its efforts to place Plaintiff in another position after the merger plan fell through.  She does not contend that

---

[4] She also asserts that both Ms. Capps and Ms. Argetsinger ultimately secured a job-sharing position elsewhere at AdventHealth.  But in the absence of evidence that Centra Care or its decisionmakers were involved in that process in any respect, no reasonable jury could infer discrimination from this fact.

she was more qualified than Ms. Brady.  And because it is undisputed that Centra Care did not consider anyone other than Ms. Brady, Centra Care similarly passed over Ms. Capps and Ms. Argetsinger for the position.  This is simply additional evidence that Centra Care treated all the Corporate Care providers the same regardless of pregnancy.

*Ms. Stephen's Reference to Seniority*

Plaintiff also argues that Ms. Stephen, when she participated in the decision to hire Ms. Brady, contradicted her own statement about relying on seniority as a factor in job placements. According to Plaintiff, this contradiction either demonstrates that Ms. Stephen lied about relying on seniority in job placement decisions in an effort to avoid placing Plaintiff in an Urgent Care position or raises significant suspicions about the hiring of Ms. Brady over Plaintiff.  No reasonable jury could draw either inference.

To the extent Plaintiff asserts that a jury could conclude that Ms. Stephen lied in her April 21, 2021, email when she advised Plaintiff that she "had to look at seniority" in making placement decisions during the transition of occupational medicine services to Urgent Care, the evidence demonstrates that Ms. Stephen in fact did rely on seniority.  Ms. Stephen indicated to Ms. Capps and Ms. Argetsinger that, in all likelihood, they could continue their job-sharing arrangement at Urgent Care when Dr. Reeves brought his occupational medicine practice to that location.  Both women had more seniority at Corporate Care than Plaintiff.  There is simply no evidence that Ms. Stephen misrepresented to Plaintiff in April 2021 how she was making placement decisions during the transition.

16

Moreover, Ms. Stephen's reference to seniority was limited to the context of responding to a question from Plaintiff about staffing needs for occupational medicine services once Corporate Care blended with Urgent Care.  Indeed, there is no evidence that the seniority of the occupational medicine providers at Corporate Care had any relevance whatsoever once Dr. Reeves resigned and the merger plan collapsed.  In fact, once the merger plan collapsed, Centra Care abandoned its efforts to place any providers from Corporate Care at Urgent Care and none of the providers obtained full-time positions at Urgent Care.  In other words, by the time Centra Care was interviewing Ms. Brady on June 10, 2021, Centra Care was not even considering the providers who were displaced with the closing of Corporate Care much less considering the relative seniority of those providers.  And there is no evidence that any policy or practice existed at Centra Care that would have required the individuals who decided to hire Ms. Brady to consider Ms. Brady's seniority when making that hiring decision or to preference Corporate Care providers in the filling of that position.  Ms. Brady's lack of seniority, then, does not permit an inference that Centra Care discriminated against Plaintiff on the basis of her pregnancy.  Of course, even assuming that Centra Care should have considered seniority when interviewing Ms. Brady, that factor would have placed Ms. Capps and Ms. Argetsinger first in line for the position filled by Ms. Brady.

In sum, no reasonable jury could conclude from the record evidence that Ms. Stephen lied about considering seniority in job placement decisions stemming from the closure of Corporate Care.  Similarly, no reasonable jury could infer from the evidence that Centra Care's failure to consider seniority when hiring Ms. Brady casts doubt on its decision to terminate Plaintiff on June 25, 2021.

*Posting policy*

Lastly, Plaintiff contends that Centra Care violated its own company policy requiring that all positions that "can be competitively filled by more than one candidate . . .be posted internally for a minimum of 3 days."[5]  While it is undisputed that the position filled by Ms. Brady was never posted, it is also undisputed that neither Ms. Stephen nor Ms. Westmoreland had any knowledge of the alleged posting policy at the time they made the decision to hire Ms. Brady.  Both individuals testified that they had never seen the written policy prior to this litigation.  Ms. Westmoreland testified that open provider positions at Centra Care were not posted internally but were filled through her and the providers' referral networks.  The only other decisionmaker, Dr. Hendrix, testified that he had no knowledge of whether the position filled by Ms. Brady was posted and no knowledge of whether posting was required.  In light of these circumstances, no reasonable jury could conclude that Centra Care's failure to post the position is evidence of pretext.  *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 977 n.25 (10th Cir. 2017) ("[A]n employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief.")

---

[5] The written policy that Plaintiff has submitted with her brief has not been authenticated by affidavit or deposition testimony and, on that basis, Centra Care urges the court not to consider it. But the policy, which appears on AdventHealth letterhead, includes an AdventHealth/Centra Care Bates number at the bottom of it, suggesting that Plaintiff received the policy in response to a discovery request.  Because Centra Care has not addressed whether the policy was produced by it, the court cannot determine whether the document might be automatically authenticated under *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir.1991) (documents on company letterhead that are produced by defendant during discovery are authentic for purposes of Federal Rule of Evidence 901).  The court, then, considers the policy in resolving the motion.

(quoting *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 Fed. Appx. 897, 910 (10th Cir. 2011));

*Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (holding that, if

decisionmakers did not believe a policy existed, mistake in failing to follow it does not establish

pretext).[6]

While the court here has addressed Plaintiff's arguments sequentially for ease of analysis,

the court emphasizes that it has considered Plaintiff's evidence in its totality and finds that

evidence, taken as a whole, insufficient to permit an inference of pretext.  *See Bekkem v. Wilkie*,

915 F.3d 1258, 1270–71 (10th Cir. 2019).  Even considering the totality of Plaintiff's evidence,

that evidence does not demonstrate that Centra Care's asserted reason for Plaintiff's termination

in the aftermath of the Corporate Care closure is "so weak, implausible, inconsistent, incoherent,

or contradictory" as to support a reasonable inference that defendant did not act for that asserted

reason.  *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007).

Plaintiff, then, has failed to meet her burden of demonstrating pretext and summary judgment in

favor of Centra Care is warranted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for

summary judgment (Doc. 77) is **granted** and defendant's motion to exclude expert witness

testimony (doc. 79) is **moot.**

---

[6] When presented with the written policy in her deposition, Ms. Argetsinger testified to her belief that Centra Care violated the policy by not posting the position filled by Ms. Brady.  But she also testified that she had not seen the policy prior to her deposition and had no knowledge as to how the policy is implemented.  Moreover, because Ms. Argetsinger was not a decisionmaker with respect to the hiring of Ms. Brady, her belief as to whether the policy was violated has no bearing on pretext.

**IT IS SO ORDERED.**


Dated this 30th day of August, 2023, at Wichita, Kansas.


s/John W. Broomes
John W. Broomes
United States District Judge